**NELSON W. GOODELL, ESQ., SBN 264734**
The Goodell Law Firm
1750 Montgomery Street, Suite 139
San Francisco, CA 94111
(415) 954-7151 (office)
(415) 954-7150 (fax)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD PEY,<br><br>Plaintiff,<br><br>　　　v.<br><br>WACHOVIA MORTGAGE<br>CORPORATION.; WELLS FARGO BANK,<br>N.A.; NDEX WEST, LLC; and DOES 1-20,<br><br>Defendants. | Case No. 3:11-cv-02922-SC<br><br>**FIRST AMENDED VERIFIED COMPLAINT FOR**<br><br>**1) Violation of Business and Professions Code Section 17200, *et seq.* – Unfair and Fraudulent Business Practices**<br>**2) Fraudulent Omissions**<br>**3) Breach of Contract**<br>**4) Breach of the Covenant of Good Faith and Fair Dealing**<br>**5) Violation of California Civil Code Section 2923.5**<br>**6) Wrongful Foreclosure**<br>**7) Declaratory Relief**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Richard Pey ("Plaintiff"), on information and belief alleges as follows:

## INTRODUCTION

1. This is an action pursuant to California's Unfair Competition Law ("UCL") Bus. & Prof. Code § 17200 *et seq.* California Civil Code § 2923.5 and other statutory and common laws in effect. The plaintiff brings this action based, in part, on Defendants' failure to disclose to Plaintiff, in Defendants Option Adjustable Rate Mortgage ("ARM") loan documents, and in the required Truth In Lending Disclosure Statements ("TILDS"), accompanying the loans, (i) the actual interest rate on which the payments listed in the

TILDS are based; (ii) that making the payments according to the payment schedule listed on the TILDS will result in negative amortization and that the principal balance will increased; and (iii) that the payment amounts listed on the TILDS are insufficient to pay both principal and interest.

2. The subject property is a single-family residence, owned by plaintiff Richard Pey, which is located at 2530 25th Avenue, Oakland, CA 94601 (the "Property") more particularly described as:

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF ALAMEDA STATE OF CALIFORNIA DESCRIBED AS FOLLOWS

All of Lot 9, and the Northeastern one-half of Lot 10, as said Lots are delineated and so designated upon the Map of Fruitvale Vista Tract, Brooklyn Township, filed October 11, 1906, Book 21 of Maps, Page 69, Alameda County Records.

APN: 026-0784-022

3. The plaintiff is the sole owner of the property.

4. There is an unlawful foreclosure sale scheduled for September 26, 2011 at 12:30 p.m. The plaintiff seeks to enjoin this sale, and any subsequently scheduled sale, until this matter is fully adjudicated.

## JURISDICTIONAL ALLEGATIONS

5. The Plaintiff is, and was at all times material to this Complaint, a resident of Alameda County, California.

6. Defendant, WACHOVIA MORTGAGE CORPORATION ("Wachovia"), at all relevant times herein was purportedly doing business in the State of California as a lender and/or loan servicer.

7.      Defendant, WELLS FARGO BANK, N.A. ("Wells Fargo"), at all relevant time herein was purportedly doing business in the State of California as a lender and/or loan servicer.

8.      Defendant, NDEX WEST, LLC ("NDEX West"), at all relevant times herein was purportedly doing business in the State of California as a trustee and conductor of non-judicial foreclosure sales.

9.      WORLD SAVINGS AND LOAN ASSOCIATION ("World Savings") was the lender that sold the plaintiff the loan at issue in this case.  World Savings was bought by Wachovia in 2007, and Wells Fargo purchased Wachovia shortly thereafter.  Therefore, all liability for the unlawful actions of World Savings is now imputed onto Wachovia and Wells Fargo.

10.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 20, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and belief, that each Doe defendant is responseible for the actions herein alleged. Plaintiff will seek leave of Court to amend this complaint when the names of said Doe defendants have been ascertained.

11.     At all times mentioned herein, whenever an act or omission of a business entity is alleged, said allegation shall be deemed to mean and include an allegation that the business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized and/or ratified by the business entity.

12.     Plaintiff is informed and believe and thereon allege that, at all mentioned times herein, Defendants were agents, servants, employees, alter egos, superiors, successors in interest, joint venturers and/or co-conspirators of each other and in doing the things herein after mentioned, or acting within the course and scope of their authority of such agents, servants, employees, alter egos, superior, successors in interest, joint venturers and/or co-conspirators with the permission

and consent of their co-defendants and, consequently, each Defendant named herein is jointly and severally liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

## STATEMENT OF FACTS

13.   WACHOVIA acquired WORLD SAVINGS in 2007, and WACHOVIA became part of WELLS FARGO in 2008.  Thus, the plaintiff's loan is currently held by WACHOVIA and WELLS FARGO.

14.   The instant action arises out of a type of loan (a "pick-a-payment" loan) that has been accused of being fraudulent by the Governor of California, Edmund Brown, and which Governor Brown, while he was still Attorney General of California, entered into a settlement agreement with WELLS FARGO on December 21, 2010 in which WELLS FARGO promised to provide loan modifications to borrowers who were defrauded by this fraudulent loan.  However, WELLS FARGO has not kept its promise to the plaintiff in this action, as it is proceeding towards foreclosure.

15.   The Option ARM loan sold to Plaintiff is a deceptively devised financial product.  The loan has a variable rate feature with payment caps.  The product was sold based upon a low, fixed interest rate,, when in fact Plaintiff was charged a different, much greater interest rate than the rate upon which the payment amount listed in the Note and TILDS were based.  The Option ARM loan World Savings sold to Plaintiff violates California Business and Professions Code Section 17200, et seq., because it both "unfairly" and "fraudulently" conceals the genuine terms of this loan.  This loan violates the "unlawful" prong of California Business and Professions Code Section 17200, et seq. by virtue of violating the Truth in Lending Act (TILA).  TILA is supposed to protect consumers, and mandates certain disclosures be made to lenders to borrowers concerning the terms and conditions of their home loans.  Defendants failed to make these disclosures in connection with the Option ARM loan sold to Plaintiff.

16.     During the loan application process, World Savings represented to Plaintiff that in accepting these loan terms, Plaintiff would be able to lower his mortgage payment and save money.

17.     Plaintiff reasonably believed, based on the representations contained in the documents World Savings provided to Plaintiff, that he would be able to refinance his loan and get a new loan before his scheduled payment significantly increased.  However, the payment schedule provided by Defendants failed to disclose, and by omission, failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiff would be unable to refinance his home as there would be little or no equity left to refinance.

18.     As a direct and proximate result of World Savings' representations, and the conduct alleged herein, Plaintiff agreed to finance his residence through Defendants' Option ARM loans. The loan sold to Plaintiff had a low payment, which Plaintiff reasonably believed would be sufficient to pay both principal and interest.  However, the true facts are that the payment schedule was not based on the interest rate disclosed in the Note and TILDS, but instead, was based on a much lower rate and, therefore, the payment schedule provided by Defendants was *guaranteed* to be insufficient to pay all of the interest due, let alone both principle and interest, which was absolutely certain to result in negative amortization.

19.     Plaintiff believed these facts to be true because that is what World Savings intended consumers to believe.  World Savings aggressively sold their product as a fixed, low interest home loan.  World Savings knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them.  World Savings also knew, however, that they were selling their product in a false and deceptive manner.  While World Savings trumpeted their low, fixed rate loans to the public, World Savings knew their promise of a low, fixed interest rate was illusory.

23.     In fact, World Savings', Wachovia's and Wells Fargo's Option ARM loan possessed a low, fixed payment that was wholly unrelated to the interest rate listed in the Note and TILDS. Unbeknownst to Plaintiff, the actual interest rate charged on the loan was not sued to determine the payment amount listed by World Savings in the Note and TILDS. World Savings in every instance and for every loan, listed a payment amount that was not, in anyway, related to the interest rate disclosed in the TILDS. In fact, the only way for plaintiff to know that the payment rate as not based on the listed interest rate was to use a sophisticated mortgage calculation device, that is, and was, far beyond the comprehension of Plaintiff.

24.     World Savings knew that the payments listed on the TILDS during the initial 10 years of the Note was not based on the interest rate listed in the Note and TILDS but instead was based on a much lower rate that was not disclosed in either the Note or the TILDS as required by law.

25.     The Note signed by the plaintiff stated that negative amortization was only a mere possibility and would occur only if the payments were not sufficient. *See Exhibit 1.* World Savings withheld and failed to disclose the fact that the loan as presented and designed, in fact, *guaranteed* negative amortization. World Savings failed to disclose and omitted the objectively material fact that negative amortization was absolutely certain to occur if the plaintiff followed the payment schedule listed by World Savings in the TILDS. This information was objectively material and necessary for plaintiff to make an informed decision because this information would have revealed that the loan's principal balance would increase if the payment schedule was followed, thereby rendering it impossible to refinance the loan at or around the time the prepayment penalty expired and/or by the time the interest and payment rates re-set. In this respect, Defendants utterly failed to place any warning in the TILDS that negative amortization *was* absolutely certain to occur. *See Exhibit 2.*

26. At all times relevant, once Plaintiff accepted World Savings' Option ARM loan contract, plaintiff had no viable option by which to extricate himself because the Option ARM loan agreement included a draconian pre-payment penalty for a period of up to three years.

27. The Option ARM loan sold by Defendant to the plaintiff has the following characteristics:

(a) The loan has a low fixed payment amount for the first 10 years of the Note;

(b) The payment amount is wholly unrelated to the interest rate listed on the Note and TILDS;

(c) The Note states that each payment will go to both principle and interest;

(d) The payment amounts listed in the TILDS are not sufficient to pay the actual interest being charged, and none of the payments up through the first ten (10) years of the Note are applied to principle;

(e) The low payment amount listed in the Note and TILDS was intended by Defendants to mislead consumers into believing that the low payments for the first ten years of the loan were based on the listed interest rate;

(f) The payment has a capped annual increase on the payment amount; and

(g) The loan includes a prepayment penalty for a period of up to three (3) years.

28. At all times relevant, World Savings, Wells Fargo and Wachovia knew, and failed to disclose and by omission failed to inform Plaintiff, in a clear and conspicuous manner, that the payment amounts set forth in Defendants' schedule of payments were insufficient to cover the actual interest rate charged on the loans.

29. At all times relevant, World Savings, Wells Fargo and Wachovia knew, and failed to disclose and by omission failed to Plaintiff, that the payment amounts set forth in Defendants' schedule of payments were insufficient to pay both principle and interest and that this was, in

fact, a negative amortization loan that was absolutely certain to, and did cause Plaintiff, to lose the equity he had in his home.

30.     Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principle and interest, one of the consequences of negative amortization is a loss of equity. World Savings, Wells Fargo and Wachovia are and at all times relevant hereto have been aware that clear and conspicuous disclosure of the actual interest rate and a payment rate that is sufficient to avoid negative amortization, and the concomitant loss of equity, is extremely important material information.

31.     At all times relevant, World Savings, Wells Fargo and Wachovia, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment amount provided to Plaintiff was insufficient to pay both interest and principle; (ii) that negative amortization was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiff's residence was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by Defendant.

32.     In spite of this knowledge, World Savings sold its ARM loan as a product that would provide Plaintiff with a low payment for up to ten years, and at all times relevant, failed to disclose and/or concealed by making partial representations of material facts when World Savings had exclusive knowledge of the material fact that negative amortization was absolutely certain to occur.  This concealed and omitted information was not known to Plaintiff, and at all times relevant, World Savings, Wachovia and Wells Fargo     failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiff and all others similarly situated.  Because the ARM loan did not provide a payment amount based on the

actual interest rate charged on the Note, the payment rate disclosed by Defendants were insufficient to pay both principle and interest, and negative amortization occurred.

33. The true facts about this loan is that it did not provide Plaintiff with a low interest rate loan with payment amounts sufficient to pay both principle and interest, and thus, was certain to result, and did result, in negative amortization.

34. In the end, the harm caused by World Savings, Wachovia and Wells Fargo's failures to disclose and omissions grossly outweighs any benefits that could be attributed to them.

35. The plaintiff did not realize the negative amortization feature of this loan until the fall of 2008 when he realized how much his outstanding balance was. Furthermore, the plaintiff's balance increased subtly over time, and did not increase dramatically, which made it further difficult for plaintiff to realize that his payments were insufficient to cover interest. It was reasonable for the plaintiff to not realize this until that time, because there was no corresponding payment increase and he had made no late payments that would warrant him inquiring of his outstanding balance.

36. The facts which World Savings, Wells Fargo and Wachovia misrepresented and concealed to Plaintiff, as alleged in the preceding paragraphs, were material to the decisions about whether to purchase the ARM loans in that Plaintiff would not have purchased these loan but for Defendants' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

37. World Savings, Wells Fargo and Wachovia engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive scheme to induce plaintiff to purchase this loan.

38. World Savings, Wells Fargo and Wachovia unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether or not Plaintiff would, in fact, receive a home loan that would actually provide the low interest and

payment rate, as promised, for up to ten years of the loan that is sufficient to pay both principle and interest.

39.     In the spring of 2009, the plaintiff's home was assessed for far more than it was really worth by the Alameda County Assessor.  The plaintiff contacted the Assessor's Office to discuss the lowering of this assessed value in order to pay property taxes based on an accurate assessed value.

40.     While the plaintiff was negotiating with the Assessor's Office, Wachovia paid the plaintiff's property taxes, without informing the Plaintiff that they would do so.

41.     Immediately thereafter, Wachovia increased the plaintiff's monthly payment on his mortgage from approximately $1,800 to $3,600, effectively doubling the plaintiff's monthly mortgage payment.

42.     Due to this large jump in the monthly payment, the plaintiff fell into default on this loan.

43.     On September 8, 2009, Wachovia, through its agent, NDEX West, recorded a Notice of Default with the Alameda County Recorder's Office.  At no time prior to filing this Notice of Default did any Defendant contact the plaintiff in person or by telephone to explore his options to avoid foreclosure, nor did the plaintiff receive any certified letters or voicemail messages asking him to contact the Defendants to discuss such options.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE

### SECTION 17200, *ET SEQ.*, "Unfair" and "Fraudulent" Business Acts or Practices

### (Against All Defendants)

44.     Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

45.     Plaintiff brings this action as a private consumer on his own behalf, pursuant to Cal. Business and Professions Code § 17200, et seq. referred to hereinafter as the Unfair Competition Law (or "UCL").

46.     Beginning on the dates indicated and all times material herein, Defendants have committed acts of unfair competition proscribed by the UCL including the practices alleged herein against Plaintiff.

47.     Business and Professions Code (CBPC) prohibits any unfair, unlawful, or fraudulent business practice. "Because Business and Professions Code Section 17200 is written in the disjunctive, it establishes three varies of unfair competition—acts or practices which are unfair, unlawful, or fraudulent." *Schvartz v. Budget Group* (2000) 81 Cal.App.4th 1153, 1159 (quoting *Podolsky v. Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647).

48.     There is a four year of statute of limitations under CBPC 17200, which can be extended based on the "delayed discovery" rule. Bus. And Prof. Code 17208; *Broberg v. Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920. The "delayed discovery" rule provides that the statute of limitation does not begin to run until the plaintiff "suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109.  Thus, a claim brought under California Business and Professions Code Section 17200 may be brought four years after the plaintiff "suspects or should suspect" that his injury was caused by some wrongdoing.

49.     As stated earlier, the "unlawful" prong of CBPC 17200 makes a business practice that violates *any* law independently actionable.  Furthermore, the statute of limitations of the other law is irrelevant, and "[a]ny action on any [Section 17200] cause of action is subject to the four-year statute of limitations created by that section." *Cortez v. Purolator Air Filtration Products* (2000) 23 Cal.4th 163, 178-79.

50.     The "unfairness" prong is "intentionally broad . . . ." <u>Podolsky v. First Healthcare Corp.</u>. (1996) 50 Cal.App. 4th 632, 647.  While the scope of the law "is not unlimited . . ., [t]he test of whether a business practice is unfair involves balancing the utility of the defendant's conduct against the gravity of the alleged victim's harm." <u>Schvartz</u>, 81 Cal.App. 3d at 1157 (citing <u>Cal-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.</u>, (1999) 20 Cal. 4th 163, 182. Finally, "[a]n unfair business practice occurs when the practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" <u>Podolsky</u>, 50 Cal. App. 4th at 647 (quoting <u>People v. Casa Blanca Convalescent Homes, Inc.</u>, (1984) 159 Cal.App.3d 509, 530.

51.     "The 'fraud' prong of Business and Professions Code Section 17200 is unlike common law fraud or deception.  A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.  Instead, it is only necessary to show that members of the public are likely to be deceived." <u>Podolsky</u>, 50 Cal.App.4th at 647-648.

52.     The instant claim is predicated on the generally applicable duty of any contracting party to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business practices.  Plaintiff hereby seeks to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

53.     During the loan application process, the loan documents provided to plaintiff uniformly failed to disclose and omitted material information that was known only to World Savings, Wachovia and Wells Fargo and could not reasonably have been discovered by Plaintiff, as set forth above.

54.     Based on the Material Omissions made and World Savings' other partially true statements and failure to disclose in the Loan Documents as alleged herein, plaintiff agreed to

finance his home through this subject Option ARM loan, and has been actually harmed as a result.

55.     World Savings intended that Plaintiff would be misled into believing that, if he made payments based on the payment schedules provided to him before he entered into the subject loan, the principal balance would be reduced with each payment when it actually increased with each payment.  The Loan Documents were designed and used for this purpose.

56.     World Savings designed, created, supplied, or were aware of the TILDS which set forth low payments for the first ten years of the loan.  World Savings further knew, but did not clearly disclose in the Loan Documents, that these listed low payments in the TILDS were not predicated on an interest rate which would not, in fact, exist after the first thirty days. World Savings knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.  World Savings further knew, and Wells Fargo and Wachovia did nothing to reveal once they assumed this loan, but did not disclose in the Loan Documents, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 125% of the original principal balance.  This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than 125% of the amount financed.  World Savings could have easily disclosed, and should have accurately and clearly disclosed in the Loan Documents, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 125% of the balance of the original financed amount, rather than merely the balance of the original financed amount.

57.     By engaging in the above-described acts and practices, World Savings has committed one or more acts of unfair competition within the meaning of the UCL.  Since Wachovia and Wells Fargo have acquired World Savings, their liability is imputed onto both Wachovia and Wells Fargo.

Unlawful

58.     In the instant case, World Savings, Wells Fago and Wachovia have egregiously violated a plethora of sections of the Federal Truth in Lending ("TILA").

59.     The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. § 226) and its Official Staff Commentary.  Compliance by lenders with Regulation Z became mandatory October 1, 1982.  Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

60.     The purpose of TILA is to protect consumers by promoting "the informed use of consumer credit by requiring disclosures about its terms and costs.  The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling . . ." 12 C.F.R. § 226.17.

61.     Regulation Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendants, must comply.  12 C.F.R. 226.17 provides that a creditor "shall make the disclosures required by this subpart clearly and conspicuously."

62.     The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing practices.

63.     The Option ARM loan at issue in this action violated TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board.  Defendants failed in a number of ways to

clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA.  These violations are apparent on the face of the TILA Disclosure Forms.

64.     12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the interest rate and payments in a clear and conspicuous manner.  Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

65.     World Savings violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 by failing to clearly and conspicuously disclose the interest rate upon which the payments listed in the TILDS are based.

66.     The scheduled payment amounts and interest rate listed in the Note and TILDS for the subject loan is unclear and inconspicuous.  The payment amounts are not based on the interest rate listed, but were instead were based upon an interest rate which was neither disclosed nor made conspicuous as required under TILA.

67.     Specifically, the Interest Rate listed in the Note is 6.840%.  However, the payment schedule listed on the TILDS is not based upon this interest rate but is some unspecified rate that is not disclosed whatsoever to plaintiff.

68.     World Savings, Wells Fargo and Wachovia failure to clearly and conspiculously disclose the interest rate upon which the payment amounts were based was, and is, deceptive.

69.     Further, World Savings knowingly and intentionally stated in the Note that the plaintiff's payment would be applied to both principle and interest.  World Savings further stated in the Note that, "from time to time" the payments "may not" be enough to cover all of the interest due on the Note.  However, in truth, if Plaintiff followed the payment schedule provided by World Savings, the payments were guaranteed to be insufficient to pay the principle and interest on the loan.

70.     At all times relevant, World Savings failed to clearly and conspicuously disclose to Plaintiff that if Plaintiff made payments according to the payment schedule set forth in the TILDS, that negative amortization was not a mere possibility, it was an absolute certainty.

71.     The payment amount provided by World Savings was intended to and did deceive consumers into falsely believing they would, in fact, receive the low interest rate upon which the payment schedule is based. While the Note states the amount of Plaintiff's initial monthly payment ($1553.05), however, the initial monthly payment stated in the Note and TILDS are not, in anyway related to the interest rate listed in the Note and TILDS. The Note lists the interest rate as 6.840 % interest rate in the Note , and the TILDS states that the Annual Percentage Rate (APR) of the Note is 7.107% (which is grossly inaccurate when calculating the actual 6.840% interest rate, which actually increased, over the life of the loan).

72.     At all times relevant, World Savings, Wachovia and Wells Fargo failed to clearly, conspicuously, and accurately disclose a payment amount that corresponds to the actual interest rate being charged on the loan sufficient to pay both principle and interest. The Note states "the payments will be applied to principle and interest." Thus, Plaintiff reasonably believed that if he made the payments according to Defendants payment schedule, the payment would, in fact, be paying off both principal and interest. However, the true fact is that the payment amounts stated in Defendants payment schedule did not include any principal on the loan at all and only covered a portion of the interest Defendants were charging on these loans.

73.     World Savings', Wells Fargo and Wachovia's failure to clearly and conspicuously disclose negative amortization violates the Truth in Lending Laws, specifically 12 C.F.R. § 226.19.

75.     12 C.F.R. § 226.19(b)(vii) provides that certain disclosures *must* be provided to a potential borrowers that whom a negative amortization is being offered to.

76.     The negative amortization disclosure is required and must be made clearly and conspicuously, and done in a manner that does not obscure its significance.  The disclosure must state whether the loan and payments established under the terms dictated by the Defendants have a negative amortization loan.

77.     At all times relevant, statutory and common law in effect make it unlawful for any lender, such as Defendants, to fail to comply with the Federal Reserve Board's Official Staff Commentary as well as Regulation Z and TILA.

78.     World Savings sold Plaintiff a loan which has a variable rate feature with payment caps. Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiff followed the payment schedule provided by Defendant. The payment schedule provided makes no reference to negative amortization and makes it appear to that the payments would, in fact, pay both principal and interest.

79.     In fact, the only place in the Note where World Savings, Wachovia and Wells Fargo even inferentially reference negative amortization caused by Plaintiff to believe that negative amortization is only a mere possibility, rather than an absolute certainty.  In fact, these loans were designed in such a way to make negative amortization as an absolute certainty.

80.     World Savings' statement that, "from time to time" negative amortization "may occur" was a half-truth and did not alert or inform Plaintiff that the payment schedule provided by Defendant would absolutely guarantee that negative amortization was going to occur on these loans.

81.     At all times relevant, World Savings', Wells Fargo and Wachovia's statement in the Note, TILDS, and any other disclosures they provided, described negative amortization was only a mere possibility, and therefore was misleading and deceptive.  In fact, Defendants' Option ARM was designed in such a way as to guarantee negative amortization.  Rather, Defendants

made it appear that as long as the payments were made according to the schedule listed in the TILDS that there would be no negative amortization.

82.     The plaintiff did not realize that this loan was negatively amortizing, and that his payments were not sufficient to cover the interest, let alone any principal, until June or July of 2008. The plaintiff was reasonable in not realizing this because he had not missed any payments on this loan, and World Savings provided no further correspondence or information that would lead him that his principal balance was secretly increasing by an exorbitant amount each month.

Unfair

83.     World Savings, Wachovia and Wells Fargo' omissions and misconduct as alleged in this action constitutes negligence and other tortuous conduct and this misconduct gave World Savings, Wachovia and Wells Fargo an unfair competitive advantage over their competitors.

84.     World Savings', Wachovia and Wells Fargo's misconduct as alleged in the Material Omissions and otherwise alleged herein was unfair because (i) it caused Plaintiff substantial injury by, among other things, causing him to lose equity in his home, (ii) there were absolutely no countervailing benefit provided to plaintiff, or other consumers who obtained this type of loan, that could possibly outweigh this substantial injury, and (iii) this injury could not have been avoided or even discovered by plaintiff, or other consumers, because it resulted from World Savings' failure to disclose and/or omission of material information in the Loan Documents that only the Defendants knew or should have known.

85.     The Material Omissions and other misconduct of Defendants alleged herein is and was likely to deceive the public, and in fact did deceive the plaintiff, and other members of the public, and violated the public policy of the State of California.

86.     The harm to plaintiff, and other members of the general public, outweighs the utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein constitutes an unfair business act or practice within the meaning of California Business and

Professions Code Section 17200 et seq. World Savings' misconduct as alleged herein gave World Savings an unfair competitive advantage over Defendants' competitors that did not engage in similar conduct.

Fraudulent

87.     Through their omissions and/or acts, practices and non-disclosures as alleged herein, World Savings designed the Loan Documents in order to deceive the public through The Material Omissions leading to consumer confusion, including, but not limited to the fact that, for the first ten years, this loan is a negatively amortization loan. Said omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the meaning of the UCL.

88.     World Savings' conduct, as fully described above, was designed and was therefore likely to deceive members of the consuming public, including plaintiff, and at all times, World Savings' and the defendants' failures to disclose and their omission of material facts in the Loan Documents have been and continue to be unfair, fraudulent, untrue and/or deceptive.

89.     As a direct and proximate result of the aforementioned omissions, acts and practices, World Savings, Wachovia and Wells Fargo received monies and continue to hold the monies expended by Plaintiff and other members of the public who purchased the ARM loans as described herein.

90.     The unfair, deceptive and/or fraudulent business practices of World Savings, Wells Fargo and Wachovia, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by Defendants' loan documents at issue, as described herein. Plaintiff has no other remedy at law that will prevent Defendant's misconduct as alleged herein from occurring.

91.     As a direct and proximate result of Wachovia, Wells Fargo and World Savings' unfair and/or fraudulent conduct alleged herein, Plaintiff is a direct victim of their unlawful conduct,

and has suffered injury in fact, and has lost money or property as a result of these three entitties' unfair competition.

92.    WHEREFORE, Plaintiff is entitled to equitable relief, including an injunction enjoining the foreclosure sale scheduled for September 26, 2011, and any subsequent sales, until this matter is fully adjudicated; restitution; restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent, unlawful, and deceptive acts and/or practices committed on plaintiff; attorneys fees and costs; declaratory relief; and a permanent injunction enjoining Defendants from still attempting to enforce this unlawful loan agreement in its present form.


### SECOND CAUSE OF ACTION

### FRAUDLENT OMISSIONS

### (Against Wachovia and Wells Fargo)

93.    Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

94.    Under common law, Wachovia and Wells Fargo had a duty to disclose to Plaintiff (i) the actual interest rate on which the payment amounts listed in the TILDS are based ;(ii) that making the payments according to the payment schedule listed in the TILDS will result in negative amortization and that the principal balance will increase; and (iii) that the payment amounts listed on the TILDS are insufficient to pay both principle and interest.

80.    Wachovia and Wells Fargo further had a duty to disclose to Plaintiff: (i) the actual interest rate being charged on the Note, (ii) that negative amortization would occur and that the "principle balance will increase"; and (iii) that the initial interest rate on the loan was not discounted, based upon Defendants partial representation of material facts when Wachovia and

Wells Fargo had exclusive knowledge of material facts that negative amortization was certain to occur.

81.     The Note states at ¶ 3(a) "I will pay Principle and interest by making payments every month."  However, the true facts are that the payment listed by Defendants on the TILDS are insufficient to pay both interest and principle.  In fact, the payment amounts listed on the TILDS are insufficient to pay enough interest to avoid negative amortization which, under the terms of the Note was absolutely certain to occur if Plaintiff made the payments according to payment schedule listed in the TILDS.

82.     The Note further states, at ¶ 3(e) "From time to time, my monthly payments *may be* insufficient to pay the total amount of monthly interest that is due."  However, the true facts are that the payment amounts listed by Defendants in the TILDS were, at all times, relevant, insufficient to pay the total amount of interest due on the note and therefore this statement as false in that it omitted important material information concerning the true facts, that negative amortization was absolutely certain to occur if consumers followed the payment schedule provided by Defendants in the TILDS.

83.     The aforementioned omitted information was not known to Plaintiff and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiff.

84.     World Savings engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not reasonably discovered by Plaintiff, regarding the true facts concerning the interest rate upon which the payment schedule was based, the negative amortization that was certain to occur, and that the payment amounts listed in the Note and TILDS are insufficient to pay both principle and interest, all of which Defendants were duty bound to clearly and conspicuously disclose in the TILD.

85.     The omitted information, as alleged herein, was material to Plaintiff in that had the information been disclosed, Plaintiff would not have entered into the loan.  Furthermore, the plaintiff was reasonable in not discovering the true nature of the loan until the summer of 2008, because the plaintiff missed no payments and his balance increased in  a very subtle manner.

86.     As a direct and proximate result of World Saving, Wells Fargo and Wachovia's failure to disclose and omission of material facts, as alleged herein, Plaintiff has suffered damages, which include, but are not limited to, the loss of equity in Plaintiff's home, and the current status of facing the imminent foreclosure of his home.

87.     As a direct and proximate result of the Loan Documents' failure to disclose and omission of material facts, as alleged herein, Plaintiff has suffered damages, which include, but are not limited to loss of equity in his home Plaintiff had prior to entering into this loan and the current state of his home being in active foreclosure proceedings.

87.     The wrongful conduct of Defendants, as set forth herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well-being of Plaintiff.  Accordingly, Plaintiff seeks punitive damages against Defendants in an amount to deter Defendants from similar conduct in the future.

88.     WHEREFORE, Plaintiff is entitled to all legal and equitable remedies provided by law, including but not limited to an injunction to enjoin the foreclosure of his home, actual damages, exemplary damages, prejudgment interest and costs.

### THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Wachovia and Wells Fargo)

89.     Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

90.     Plaintiff entered into a written loan agreement—the contract or Note--with World

Savings, which was subsequently assigned to Wachovia and Wells Fargo.  The Note was drafted

by World Savings and could not be modified by Plaintiff.  The Note describes the terms and

respective obligations of the parties herein.

91.     The Note states the interest rate and the payment amounts required for Plaintiff to pay off

the loan.

92.     The Note further states that Plaintiff "will pay Principle and interest by making payments

every month."

93.     The TILDS, which accompanied the Note, sets forth a payment schedule for Plaintiff to

follow.

94.     The interest rate listed in the Note and in the TILDS was not used to calculate the

payment amounts stated in the Note and listed in the TILDS.  At all times relevant, Defendant

knew that the payment schedule was not based on the interest rate listed, but instead, was based

on a much lower rate which caused the loan contract to be uncertain and ambiguous as to the

amount plaintiff would have to pay each month in order to avoid negative amortization.

Defendants are responsible for the uncertainty and ambiguity as alleged herein, because World

Savings purposefully stated in the Note that Plaintiff "will pay Principle and interest by making

payments every month" and then providing Plaintiff with a payment schedule which is

inconsistent with, and not based on the interest rate listed in the Note.

95.     At all times relevant, World Savings drafted the Note and did not allow Plaintiff any

opportunity to make changes to the Note and due to Defendants superior bargaining position, the

contract was offered on a take it or leave it basis.  As such, the loan contracts at issue are

contracts of adhesion.

96.     World Savings, Wachovia and Wells Fargo expressly and/or through their conduct and

actions agreed that Plaintiff's monthly payment obligations would be sufficient to pay both the

principal and interest owed on the loan.  World Savings, Wachovia and Wells Fargo breached this agreement by failing to apply any of Plaintiff's payments to principal.

97.     On the other hand, Plaintiff did all that was asked of him under the Contract.  It was not until the Spring of 2009 that Plaintiff began missing payments, and this was due to the fact that Wachovia paid off plaintiff's property taxes, in the midst of plaintiff and the Alameda County Assessor's Office negotiating a lower tax liability, and then forced Plaintiff to make payments that were double what he had been making.

98.     As a result of World Savings, Wachovia and Wells Fargo's breach of the agreement, Plaintiff has suffered harm.  Plaintiff has incurred additional charges to his principal loan balances.  Plaintiff has incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiff's principal loan balances. Furthermore, Defendant's breaches have placed Plaintiff in danger of losing home to foreclosure, and there is currently a foreclosure sale scheduled for September 26, 2011 at 12:30 p.m.

99.     WHEREFORE, Plaintiff is entitled to injunctive relief, declaratory relief, compensatory damages proximately caused by Defendants breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Wachovia and Wells Fargo)**

100.    Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

101.    World Savings entered into written agreements with Plaintiff based upon the terms on the loans as stated in the Note and TILDS.

102.    The Note and TILDS expressly and impliedly agreed to provide a loan secured by the Plaintiff's residence, and that the loan would have a low payment and interest rate for up to the first 10 years of the loan.

103.    The Note and TILDS expressly and impliedly agreed that if Plaintiff made the monthly payments in the amount prescribed by Defendants in the TILDS, that negative amortization would not occur.  As alleged herein, the Note(s) expressly state and/or imply that Plaintiffs' monthly payment obligations *will* be applied to pay both principal and interest.

104.    World Savings, Wells Fargo and Wachovia unfairly interfered with Plaintiff's rights to receive the benefits of the contract.  This loan has cost Plaintiff's thousands more than represented by these three defendants.  Plaintiff did not receive the fixed low interest rate home loan promised to him by World Savings.  Instead, as alleged herein, Defendants foisted upon Plaintiff a loan which was guaranteed to result in negative amortization.  As a result, World Savings, Wells Fargo and Wachovia have caused Plaintiff to lose equity in his home and therefore have denied Plaintiff the enjoyment and security of his most important investment.

105.    Plaintiff did all that was required of him under the contract.  The plaintiff did not even miss a payment on this agreement until the spring of 2009, and that was due to Wachovia doubling his payment after improperly paying his property taxes for him while he was negotiating a lower tax liability with Alameda County.

106.    At all times relevant, World Savings, Wells Fargo and Wachovia breached, as alleged herein, were committed with willful and wanton disregard for whether or not Plaintiff would actually receive a home loan that would provide the promised low interest and payment rate for up to ten years sufficient to pay both principle and interest.

107.    WHEREFORE, Plaintiff is entitled to declaratory relief, all damages proximately caused by Defendant's breach of the implied covenant of good faith and fair dealing as alleged herein,

punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION

### VIOLATIONS OF CIVIL CODE SECTION 2923.5

**(Against All Defendants)**

108.    Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

109.    Wachovia, Wells Fargo and NDEX West, LLC violated Civil Code Section 2923.5 by failing to contact the plaintiff, in person or by telephone, at least 30 days prior to recording the Notice of Default on September 8, 2009.

110.    Despite Wachovia's claim, it could not and did not exercise "due diligence" to contact the plaintiff, as the plaintiff received no telephonic messages or any certified letters regarding his home mortgage in the summer of 2009.

111.    A failure to comply with California Civil Code Section 2923.5 renders the Notice of Default invalid, and a secured creditor must rescind the Notice of Default and not cause a non-judicial foreclosure sale to transpire until substantively complying with Section 2923.35 "and recording a new Notice of Default in the wake thereof." *Mabry v. Superior Court* 185 Cal.App. 4th 208, 236-37 (2010).  NDEX West, LLC participated in this unlawful conduct by recording a Notice of Default that falsely states that California Civil Code Section 2923.5 has been complied with.

112.    WHEREFORE, Plaintiff is an order rescinding the Notice of Default, and enjoining Defendants, and each of them, from recording a new Notice of Default, or otherwise re-initiating foreclosure proceedings, until they contact the plaintiff and explore his options to avoid foreclosure, as required by California Civil Code Section 2923.5.

## SIXTH CAUSE OF ACTION

### WRONGFUL FORECLOSURE

#### (Against All Defendants)

113.   Plaintiff realleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

114.   As a result of the numerous unlawful actions that all defendants committed before and during the foreclosure process described in detail in this complaint, the plaintiff is now threatened with the imminent loss of the title to his property.

115.   As a consequence of this intentional, negligent, or reckless conduct, the plaintiff has suffered great mental anguish, caused by the potential loss of title and possession of his home.

116.   WHEREFORE, Plaintiff is entitled to declaratory relief, all damages proximately caused by Defendant's unlawful conduct as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## SEVENTH CAUSE OF ACTION

### DECLARATORY RELIEF

#### (Against All Defendants)

117.   Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in all paragraphs as set forth above.

118.   An actual controversy has arisen and now exists between Plaintiff and all defendants and their respective rights and duties.

119.   Plaintiff contends that all Defendants should be enjoined from conducting the non-judicial foreclosure sale on September 26, 2011, or any future sale until this action is resolved.

120.   WHEREFORE, Plaintiff is entitled to declaratory relief, all damages proximately caused by Defendant's unlawful conduct as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## **PRAYER**

WHEREFORE, Plaintiff prays judgment as follows:

1. That the Notice of Default recorded on September 8, 2009 be declared invalid;

2. That the Trustee's Sale scheduled for September 26, 2011, and any future sales, be enjoined;

3. For a declaration that Plaintiff is the prevailing party;

4. For actual damages according to proof;

5. For compensatory damages as permitted by law;

6. For consequential damages as permitted by law;

7. For punitive damages as permitted by law;

8. For equitable relief, including restitution;

9. For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

10. For interest as permitted by law;

11. For Declaratory Relief;

12. For reasonable attorneys' fees and costs;

13. For such other relief as is just and proper.

Dated: August 25, 2011

The Goodell Law Firm

By: _____

NELSON W. GOODELL
Attorney for Plaintiffs

## REQUEST FOR TRIAL BY JURY

Plaintiff requests that the trial in this case be by jury.

Dated: August 25, 2011

THE GOODELL LAW FIRM

By: _____

NELSON W. GOODELL
Attorney for Plaintiffs

1 | **NELSON W. GOODELL, ESQ., SBN 264734**
The Goodell Law Firm
2 | 1750 Montgomery Street, Suite 139
San Francisco, CA 94111
3 | (415) 954-7151 (office)
(415) 954-7150 (fax)
4

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD PEY, | ) Case No. 3:11-cv-02922-SC |
| | ) |
| Plaintiff, | ) **VERIFICATION OF FIRST AMENDED** |
| | ) **COMPLAINT** |
| v. | ) |
| | ) |
| WACHOVIA MORTGAGE | ) |
| | ) |
| CORPORATION, WELLS FARGO BANK, | ) |
| | ) |
| N.A., NDEX WEST, LLC, and DOES 1-20, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

I, RICHARD PEY, am the plaintiff in the above-entitled action. I have read the

foregoing complaint, and know the contents thereof. The same is true to my own knowledge,

except as to those matters which are therein alleged on information and belief, and as to those

matters, I believe them to be true.

I declare under penalty of perjury of the laws of the United States and the State of

California that the foregoing is true and correct.

**Date: August 24, 2011**

            /s/ Richard Pey
            RICHARD PEY

-1-

# EXHIBIT 1

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER _____          DATE  August 11, 2006

BORROWER(S)   RICHARD PEY, AN UNMARRIED MAN   sometimes called "Borrower" and sometimes simply called "I" or "me"

PROPERTY ADDRESS  2530 25TH AVE, OAKLAND, CA  94601-1251

**1   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U S  $450,000.00 , called "Principal," plus interest, to the order of the Lender  The  Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK., ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred

**2   INTEREST**
**(A)   Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid  I will pay interest at the yearly rate of 6 840%  The interest rate I will pay  may change as described in this Section 2  Interest will be charged on the basis of a twelve month year and a thirty day month

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

**(B)   Interest Change Dates**
The interest rate I will pay may change on the 1st day of October, 2006 and on the same day every month thereafter  Each date on which my interest rate could change is called an "Interest Change Date"  The new rate of interest will become effective on each Interest Change Date

**(C)   Interest Rate Limit**
My lifetime maximum interest rate limit is 11.950%, called "Lifetime Rate Cap"



SD263A (2004.03-1)          ADJUSTABLE NOTE          CA          LENDERS USE ONLY
                                        Page 1

(D)  Index

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the interest rates currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit amounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments as determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

(E)  Calculation of Interest Rate Changes

Lender will calculate my new interest rate by adding 3.050 percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(D) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

(F)  Alternative Index

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F): (a) the Index is "available" if  (b) the Index is for any reason no longer published, or (c) the Lender, in its sole discretion, determines that the Index is not "available" if  (b) the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

2.  PAYMENTS

(A)  Time and Place of Payments

I will make my payments every month

I will make my monthly payments on the 1st day of each month beginning on **October 1, 2005**. I will make these payments every month until I have paid (I) all the Principal and interest, and (b) any other charges described below that I may owe under this Note, and (c) any charges that may be due under the Security Instrument  if, on **September 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,553.05**. This amount will change as described in Sections 2(C) and 3(C) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance

(C)  Payment Change Dates

My monthly payment will change as required by Section 3(D) below beginning on the **1st day of October, 2007** and on that day every 12th  month thereafter  Each of these dates is called a "Payment Change Date."  My monthly payment will change at any time Section 3(F) or 3(G) below requires me to pay a different amount

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below

(D)  Calculation of Payment Changes

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform the Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

(E)   Deferred Interest; Additions to My Unpaid Principal

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

(F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(D) and 3(E) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

(G)   Payment Cap Limitation; Exceptions

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(E) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

(H)   Notice of Payment Changes

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

4.   FAILURE TO MAKE ADJUSTMENTS

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

5   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.

I may pay Deferred Interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of principal. During the first year of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first year of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

6.   MAXIMUM LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7   BORROWER'S FAILURE TO PAY AS REQUIRED

(A)   Late Charges for Overdue Payments

If the Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 5.00% of my overdue payment of Principal and interest I will pay this late charge promptly but only once on each late payment.

(B)   Default

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts, or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

(C)   Notice of Default

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

(D)   No Waiver by Lender

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

(E)   Payment of Lender's Costs and Expenses

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses may include, for example, reasonable attorneys' fees and court costs.

8   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at 2530 25TH AVE, OAKLAND, CA  94601-1251, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under the Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

11   SECURED NOTE - ACCELERATION

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property  or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of this Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

Exception to Acceleration of Payment of Sums Secured. If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

    (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender,

    (ii)    Lender approves the creditworthiness of the transferee in writing,

    (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

    (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

    (v)    the transferee executes an assumption agreement which is satisfactory to Lender

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**12.  GOVERNING LAW; SEVERABILITY**

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note

**13.  CLERICAL ERRORS**

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

**14.  LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

SIGNATURE PAGE

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN
CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE
PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
RICHARD FEY

# EXHIBIT 2

| WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z |
|---|---|

Date: August 11, 2006

Customer's Name:
RICHARD PEY

Loan No.: 0043579382

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total price of your purchase on credit including your down payment of Not Applicable |
| 7.107 % | $ 800,299.92 | $ 433,843.22 | $1,234,143.14 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $1,553.05 | 10/01/06 |
| 12 | 1,669.53 | 10/01/07 |
| 12 | 1,794.74 | 10/01/08 |
| 12 | 1,929.35 | 10/01/09 |
| 12 | 2,074.05 | 10/01/10 |
| 12 | 2,229.60 | 10/01/11 |
| 12 | 2,396.82 | 10/01/12 |
| 12 | 2,576.58 | 10/01/13 |
| 12 | 2,769.82 | 10/01/14 |
| 12 | 2,977.56 | 10/01/15 |
| 239 | 4,043.71 | 10/01/16 |
| 1 | 4,043.25 | 09/01/36 |

**VARIABLE RATE:** THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance: You may obtain property insurance from anyone who is acceptable to the Lender.

Security: You are giving a security interest in the real property located at 2530 25TH AVE, OAKLAND, CA 94601-1251.

Filing Fees: $ 85.00

Late Charge: If a payment is late, you will be charged 5.00% of the payment.

Prepayment: If you pay off the loan early, you MAY have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption: SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale: If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

_____      _____
Date

CA
LENDER'S USE ONLY

0 7 3

GF424A1 (2004-03-2)
FINAL     DISTRIBUTION:    1 COPY-RETURN SIGNED TO LENDER     1 COPY-CUSTOMER     2 COPIES-FILE